UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| CHRISTOPHER WATKINS, | Case No. 3:20-cv-00509-MMD-WGC |
| Plaintiff, | ORDER |
| v. | |
| RAPID FINANCIAL SOLUTIONS, INC, d/b/a ACCESS FREEDOM CARDS, *et al.*, | |
| Defendants. | |

I.   **SUMMARY**

This is a class action lawsuit brought by Plaintiff Christopher Watkins, a former inmate under the custody of the Nevada Department of Corrections ("NDOC"), who received the return of his money upon his release in the form of a prepaid debit card and funds respectively issued and managed by Defendants Rapid Financial Solutions, Inc. ("Rapid") and Axiom Bank N.A. ("Axiom").[1] (ECF No. 1-2.) Plaintiff alleges that the forced use of these cards on inmates—commonly referred to as "prison release cards"—are in violation of both federal and state laws. Before the Court is Defendants' motion to compel arbitration of Plaintiff's claims. (ECF No. 13 ("Motion").)[2] Because the Court finds that Plaintiff did not mutually assent to the Cardholder Agreement and that an unconscionable adhesion contract was formed, Defendants' Motion is denied.

II.   **BACKGROUND**

The following facts are adapted from Plaintiff's complaint, and the briefs and attached exhibits relating to the Motion.

---

[1]Cache Valley Bank ("Cache") was named a defendant in Plaintiff's complaint, but the parties stipulated to dismiss without prejudice all claims against Cache. (ECF No. 12.)

[2]The Court has further reviewed Plaintiff's response (ECF No. 20) and Defendants' reply (ECF No. 21).

1

### A.    Release Card

2        Plaintiff Christopher Watkins was an inmate in the custody of the NDOC and

3   housed at the Stewart Conservation Camp ("SCC"). (ECF No. 1-2 at 5.) While in custody,

4   Plaintiff was voluntarily employed as a firefighter and earned $1.00 per hour; $0.10 of his

5   hourly earnings were transferred to his prison trust account. (ECF No. 20-3 at 2.) Plaintiff's

6   family members additionally deposited money into the account. (*Id.*)

7        Ten days prior to his release, Plaintiff met with his case worker who instructed him

8   to sign documentation that would close out his trust account. (*Id.*) The case worker notified

9   Plaintiff that an approximate $400.00 in his account would be loaded onto an Access

10  Freedom Card ("release card" or "card").[3] (*Id.*) Plaintiff declares that he was "not told what

11  it was that he was signing and was not given an option not to sign" and "not given an

12  option to receive his money by any other means." (*Id.*) He was "not given a brochure or

13  any documentation regarding the Access Freedom Card until after [his] release." (*Id.* at

14  2.) Moreover, the case worker informed Plaintiff that the release card was activated and

15  would be given to him on the date of his release. (*Id.* at 3.)

16       On April 6, 2020, the NDOC credited $431.20 onto the release card. (ECF No. 13-

17  5 at 2.) Plaintiff activated the release card on April 7, 2020. (ECF No. 13-1 at 6.) Shortly

18  thereafter on April 10, 2020, Plaintiff was charged a weekly account maintenance fee of

19  $1.50. (ECF No. 13-5 at 2.)

20       On April 13, 2020, Plaintiff was released from NDOC custody and was dropped off

21  at a 7-Eleven convenient store down the street from the prison facility. (ECF Nos. 20-3 at

22  3, 1-2 at 9.) He received an Access Freedom Card issued by Rapid with his pre-loaded

23  account funds, which were maintained by Axiom. (ECF No. 1-2 at 5-6, 9.) Rapid affixes

24  its card to a tri-folded Cardholder Agreement (the "Agreement"). (ECF No. 13 at 5.)

25  Plaintiff attempted to withdraw money from the release card at an ATM to purchase a bus

26

27          [3]A Customer Transaction Report of Plaintiff's release card reflects that on April 6,
28  2020, the NDOC credited $431.20 onto the card and subsequently credited an additional
    $17.48 onto the card on May 5, 2020. (ECF No. 13-5 at 2.)

1 pass, but the transaction was declined. (ECF No. 20-3 at 3.) He then went into the 7-

2 Eleven to use a telephone to call the number on the card. (*Id.*) Plaintiff was told over the

3 phone that the card was not activated but that he could use the card in a few minutes.

4 (*Id.*) On the date of Plaintiff's release, $12.99 at the 7-Eleven, $101.59 at a Save Mart,

5 and $5.73 at Dallas-Fort Worth International Airport, were deducted from the card. (ECF

6 No. 13-5 at 2.)

7       **B.**    **Cardholder Agreement**

8       In fine print at the top-left corner of the Cardholder Agreement, it states that

9 effective June 2019:

10
11     This Cardholder Agreement (this "Agreement") sets forth the terms of your prepaid Card. Please read it carefully and retain it for your records. If you do not agree to these terms, do not use the card; or If you would like to cancel
12     call Customer Service at 1-877-287-2448. Otherwise, your acceptance and/or use of the Card will be evidence of your agreement to these terms.

13     NOTE: THIS AGREEMENT REQUIRES CERTAIN DISPUTES TO BE
14     RESOLVED BY WAY OF *BINDING ARBITRATION*, RATHER THAN BY JURY TRIAL. THE TERMS OF THE ARBITRATION CLAUSE APPEAR AT
15     THE END OF THIS AGREEMENT.

16 (ECF No. 13-3 at 2 (capitalization and emphasis in original).) The Agreement additionally

17 states that "[t]he arbitration will be administered by the American Arbitration Association

18 (the 'AAA') under its Commercial Arbitration Rules (the 'Arbitration Rules')." (*Id.*) It further

19 states, "this provision limits or waives certain of your rights, including the right to bring a

20 court action and to have a jury trial; there will be no class claims in arbitration." (*Id.*)

21       On the other side of the Cardholder Agreement, it states that there is a weekly

22 $1.50 fee that "begins 3 calendar days after the card is activated or 90 days after card

23 issuance if not activated." (*Id.* at 3.) There is a $2.75 ATM withdrawal fee, $2.75 ATM

24 decline fee, $1.50 ATM balance inquiry fee, and $2.99 card replacement fee. (*Id.*) The

25 Agreement includes instructions on how to register the card and request a paper check.

26 (*Id.*) Both the Agreement and the release card provide a toll-free customer service

27 number. (ECF No. 13 at 8.)

28

1    ### III.   LEGAL STANDARDS

2       "The [Federal Arbitration Act ("FAA")], 9 U.S.C. § 1 *et seq.*, requires federal district

3    courts to stay judicial proceedings and compel arbitration of claims covered by a written

4    and enforceable arbitration agreement." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171,

5    1175 (9th Cir. 2014) (citing 9 U.S.C. § 3). The FAA limits the district court's role to

6    determining whether a valid arbitration agreement exists, and whether the agreement

7    encompasses the disputes at issue. *Id.* (citing *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,

8    207 F.3d 11236, 1130 (9th Cir. 2000)). "The Arbitration Act establishes that, as a matter

9    of federal law, any doubts concerning the scope of arbitrable issues should be resolved

10   in favor of arbitration . . .." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S.

11   1, 24-25 (1983). Thus, "[t]he standard for demonstrating arbitrability is not a high one; in

12   fact, a district court has little discretion to deny an arbitration motion, since the Act is

13   phrased in mandatory terms." *Republic of Nicar. v. Std. Fruit Co.*, 937 F.2d 469, 475 (9th

14   Cir. 1991). However, "arbitration is a matter of contract and a party cannot be required to

15   submit to arbitration any dispute which he [or she] has not agreed so to submit." *AT&T*

16   *Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *United*

17   *Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). "[T]he

18   party seeking to compel arbitration[] has the burden of proving the existence of an

19   agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio*

20   *Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citation omitted).

21   ### IV.   DISCUSSION

22       Plaintiff opposes arbitration and, in support of his position, explicitly cites *Reichert*

23   *v. Keefe Commissary Network, LLC,* Case No. C17-5848RBL, 2018 WL 2018452 (W.D.

24   Wash. May 1, 2018),[4] a similar dispute in which Rapid is a defendant. (ECF No. 20 at 5.)

25   _____

26       [4]The Court notes that the Ninth Circuit vacated and remanded the district court's order denying a defendants' motion to compel arbitration against a *different* plaintiff in the

27   same action. *See Reichert v. Keefe Commissary Network, LLC*, Case No. C17-5848RBL, 2019 WL 7833109 (W.D. Wash. Oct. 30, 2019) ("*Reichert I*"), *vacated and remanded by*

28   *Reichert v. Rapid Invs., Inc.*, 826 F. App'x 656 (9th Cir. 2020). The district court subsequently denied again defendants' motions to compel arbitration. *See Reichert v.*

Specifically, Plaintiff argues that the Motion should be denied based on offensive nonmutual issue preclusion,[5] and that there was no mutual assent or consideration with respect to the Cardholder Agreement. (*Id.* at 5-8.) Because the issue of mutual assent is dispositive—as further discussed below—the Court will only address the parties' arguments in relation to that issue and will not reach the consideration argument.

To enforce an arbitration agreement, the Court must determine (1) whether the parties agreed to arbitrate their disputes, and (2) if the claims in dispute are within the scope of the arbitration agreement. *See Nguyen*, 763 F.3d at 1175. In making these determinations, the Court applies "ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under Nevada law[6] a formation of a contract requires there be: 1) an offer and acceptance; (2)

_____

*Keefe Commissary Network, LLC*. Case No. C17-5848 BHS, 2021 WL 2223709 (W.D. Wash. June 2, 2021) ("*Reichert II*")

[5]The Court declines to dismiss the Motion based on issue preclusion. An important fact that distinguishes the cited *Reichert I* order from this action is that plaintiff Reichert asserted that he did not receive a copy of the Cardholder Agreement when he was released. *See Reichert I*, 2018 WL 2018452 at *1 ("Reichert claims he did not receive a copy of the Cardholder Agreement when he was released[.]"). More analogous to this action is the subsequent order in *Reichert II*, *see note 4, supra*, where plaintiff Moyer did receive the Cardholder Agreement and the court found no contractual relationship existed and denied arbitration. *See* 2021 WL 2223709 at *6 ("It is undisputed at a minimum that [Moyer] received an Agreement with his February 2018 card, so the Court focuses its analysis on that interaction.") Because the parties in this action have not briefed issue preclusion with respect to *Reichert II*, this Court will not dismiss the Motion on this basis. *See United States v. Walker River Irrigation Dist.,* 890 F.3d 1161 (9th Cir. 2018) (stating that the Ninth Circuit has "never 'upheld a dismissal order for claim or issue preclusion where the parties were not given an opportunity to be heard on the issue[.]'" (quoting *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1055 (9th Cir. 2005))).

[6]The Court notes that the Cardholder Agreement has a choice of law provision that states, "[a]ll matters, whether sounding in contract, tort or otherwise, relating to the validity, construction, interpretation or enforcement of this Agreement shall be determined by the laws of the United States and, to the extent not inconsistent therewith, *the laws of the State of Utah*." (ECF No. 13-3 at 2 (emphasis added).) However, the parties do not appear to dispute that the Agreement is governed by Nevada law. (ECF Nos. 13 at 15 (citing formation of a contract under Nevada law); 20 at 8 (stating that "[t]he law in Nevada is no different.").) Moreover, pursuant to NRS § 97B.100(1), "[a] choice of law provision in a consumer form contract which provides that the consumer form contract is to be governed or interpreted pursuant to the laws of another state is *void*. Enforcement and interpretation of such a contract *must be governed by the laws of [Nevada]* if enforcement of the consumer form contract is sought in a court of [Nevada]." (emphasis added.) Accordingly, this Court will apply the principles governing the formation of contracts in accordance with Nevada law.

1    a meeting of the minds; and (3) consideration. *See May v. Anderson*, 121 Nev. 668, 672

2    (Nev. 2005). "A meeting of the minds exists when the parties have agreed upon the

3    contract's essential terms." *Certified Fire Prot. Inc. v. Precision Constr. Inc.*, 283 P.3d

4    250, 255 (Nev. 2012).

5         In their Motion, Defendants assert that the arbitration clause of the Cardholder

6    Agreement is enforceable because Plaintiff had activated and voluntarily used the release

7    card. (ECF No. 13 at 16-18.) Defendants further assert that Plaintiff had the option of

8    rejecting the release card by calling Rapid and requesting a check for the full balance on

9    the card. (*Id.* at 10.) Plaintiff counters that while inmates are in custody, they are unable

10   to exercise any free will to consent or assent to a contract such as the Cardholder

11   Agreement. (ECF No. 20 at 7.) The Court is persuaded by the evidence that there was

12   no mutual assent to the Agreement based on activation, nevertheless an adhesion

13   contract was formed but the contract is unconscionable and therefore unenforceable. The

14   Court therefore agrees with Plaintiff but will address Defendants' arguments in turn.

15        **A.    Activation**

16        Defendants argue that Plaintiff's telephone call to Rapid to activate the release

17   card constitutes acceptance of the Cardholder Agreement. The Court disagrees.

18         There is no evidence to support that Plaintiff was in possession of the Cardholder

19   Agreement when the card was activated on April 7, 2020. Plaintiff's sworn declaration

20   states he was "not given a brochure or any documentation" regarding the release card

21   "until after [his] release" on April 13, 2020.[7] (ECF No. 20-3 at 2.) Nor did anyone at the

22   SCC inform him "about the purpose or importance of any terms and conditions" of the

23   release card. (*Id.* at 4.) While Plaintiff does not appear to dispute receiving the Agreement

24   (on April 13, 2020), or that he called to activate the card on April 7, 2020, the record does

25   not reflect that Plaintiff had a copy of the Agreement when he called Rapid to be aware

26   of the terms and conditions. Thus, Defendants' assertion that the Agreement and release

27

28         [7]Defendants affirm this fact in their Motion by stating that "Plaintiff received the
     Cardholder Agreement upon release from SCC." (ECF No. 13 at 10.)

1  card provided detailed information about the contract to Plaintiff (ECF No. 13 at 5-9) does

2  not warrant consideration as that information was not in Plaintiff's possession when he

3  activated the card on April 7, 2020.

4       Moreover, Plaintiff declares that he never signed "anything agreeing to any terms"

5  relating to the release card. (ECF No. 20-3 at 4.) His sworn declaration makes clear that

6  he was unaware, therefore could not purposefully intend by any action, to "be potentially

7  bound by a contract" with Defendants. (*Id.*) It is Defendants' burden to prove based on a

8  preponderance of the evidence that an enforceable contract existed, which includes

9  demonstrating that Plaintiff had a copy of the Cardholder Agreement when he purportedly

10  accepted the contract. *See Knutson*, 771 F.3d at 565. Despite Defendants' assertion that

11  there was a "meeting of the minds" because Defendants proffering a written contract

12  accepted via activation (ECF No. 13 at 20), the Court finds differently because Plaintiff

13  was unaware of the essential terms nor in possession of the Agreement to inform him

14  otherwise at the time of activation. As such, there was no meeting of the minds and no

15  mutual assent. *See Certified Fire Prot. Inc.,* 283 P.3d at 255.

16       **B.    Voluntary Use**

17       Defendants argue that Plaintiff's voluntary use of the release card constitutes

18  consent pursuant to the Cardholder Agreement. The relevant language of the Agreement

19  states, "your acceptance and/or use of the Card will be evidence of your agreement."

20  While the Court agrees with Defendants that Plaintiff accepted and used the card, the

21  resulting adhesion contract is unenforceable as it is both procedurally and substantively

22  unconscionable.

23       In Nevada, an adhesion contract is "a standardized contract form offered to

24  consumers of goods and services essentially on a 'take it or leave it' basis, without

25  affording the consumer a realistic opportunity to bargain, and under such condition that

26  the consumer cannot obtain the desired product or service except by acquiescing to the

27  form of the contract." *Obstetrics & Gynecologists Wixted v. Pepper*, 693 P.2d 1259, 1260

28  (Nev. 1985) (citation omitted). An adhesion contract's distinct feature is that "the weaker

7

1   party has no choice as to its terms." *Id.* The contract is enforceable if it "falls within the

2   reasonable expectations of the weaker or adhering party and is not unduly oppressive."

3   *Id.* at 1261 (internal quotes and citation omitted). "However, courts will not enforce against

4   an adhering party a provision limiting the duties or liabilities of the stronger party absent

5   plain and clear notification of the terms and an understanding consent." *Id.* Generally,

6   procedural and substantive unconscionability must be present for a court to exercise

7   discretion not to enforce. *See Burch v. Second Jud. Dist. Court*, 49 P.3d 647, 650 (Nev.

8   2002). Courts may apply a sliding scale test for unconscionability. *See id.* at 650-51.

9           As explained above, no contract was formed on April 7, 2020. However, Plaintiff

10  received the Cardholder Agreement upon his release from custody and thus on notice of

11  the terms and relevant language—"your acceptance and/or use" is evidence of your

12  agreement. Pursuant to the language, by virtue of receiving the release card, Plaintiff had

13  "accepted" the Agreement the moment he received the card tri-folded with the Agreement.

14  *See Reichert II*, 2021 WL 2223709 at *6 (articulating that plaintiff inmate would have

15  already accepted a prison release card when he took the card into his possession).

16  Plaintiff's acceptance is further supported by his declaration. (*See* ECF No. 20-3 at 3 ("I

17  then went inside the 7-11 to use their telephone to call the phone number on the Access

18  Freedom Card. I was informed that the card had not yet been activated but I would be

19  able to use it within a few minutes.").) As such, the Court finds that an adhesion contract

20  was formed.

21          However, the Court also finds both procedural and substantive unconscionability

22  exists in this instance and declines to enforce the arbitration clause or the contract. *See*

23  *Clark v. Honderman*, Case No. 2:19-cv-01807-KJD-DJA, 2021 WL 2688628, at *2 (D.

24  Nev. Feb. 9, 2021) (citation omitted) ("[W]hether an agreement is procedurally

25  unconscionable, a court must evaluate how the parties negotiated the contract and the

26  circumstances of the parties at that time."); *Godhart v. Tesle, Inc.*, Case No. 2-19-cv-

27  01541-JAD-VCF, 2020 WL 2992414, *2 ("Substantive unconscionability focuses on

28  whether an agreement's terms are one-sided or bilateral.").

8

1       Here, Plaintiff was an inmate in custody of the NDOC. In this position, he received

2 the card "*from a condition of absence of liberty of choice which Defendant[s] reasonably*

3 *could have anticipated.*" *Regan v. Stored Value Cards, Inc.*, 85 F. Supp. 3d 1357, 1364

4 (N.D. Ga. 2015) (emphasis in original). Plaintiff's sworn declaration states he did not ask

5 or apply for the card; he was not told what he was signing when he was given paperwork

6 to sign for the card; he was not given an option to not sign paperwork; and he was never

7 informed he could receive his money back in any other form other than the release card.

8 (ECF No. 20-3 at 2, 4.) Plaintiff further declares that he was unaware and did not have

9 reason to believe that receiving the release card bound him to a contract with Defendants.

10 (*Id.* at 4.)

11       Additionally, Plaintiff had just been released from prison and was dropped off at a

12 7-Eleven. He received the Cardholder Agreement and the release card simultaneously

13 upon his release. His money was already preloaded onto the card—even before he called

14 to activate it on April 7, 2020—and he was already subject to Defendants' terms as he

15 was charged a $1.50 weekly account maintenance fee. That amount may appear nominal

16 to some, but to an inmate earning $1.00 per hour as a voluntary firefighter, with only $0.10

17 going into his account, that amount cannot be understated. Moreover, he did not have

18 cash or any method of payment other than the release card and had no means of

19 transportation. His only option was to use the card to purchase a bus pass. The

20 overwhelming facts in this case provide that Plaintiff was not offered a release card on a

21 "take it or leave it" basis, *see Pepper*, 693 P.2d at 1260. Rather, Plaintiff believed he had

22 to take it if he wanted the return of his money. Accordingly, the Court finds there was

23 procedural unconscionability as Plaintiff was never in a position to negotiate a contract or

24 its terms given the circumstances. *See Clark*, 2021 WL 2688628, at *2.

25       Upon receiving the release card, Plaintiff was bound to a $1.50 weekly—not

26 monthly or yearly—fee, $2.75 ATM withdrawal fee, $1.50 ATM balance inquiry fee, $2.75

27 ATM decline fee, and a $2.99 card replacement fee. More concerning, however, is that

28 by receiving the card to access his money, Plaintiff was renouncing his right to sue or

1    bring a class action. *See Reichert II*, 2021 WL 2223709, at *7 (stating that a reasonable

2    person in an inmate's position cannot be expected to understand he was renouncing his

3    right to sue or bring a class action). While Defendants state that their cards provide

4    services and features such as security and immediate access to funds (ECF No. 13 at

5    19), those are not services and features that Plaintiff applied for or requested, but

6    nevertheless was subject to fees in return, even before receiving the card. The Court thus

7    finds that substantive unconscionability also exists here. *See Godhart*, 2020 WL 2992414

8    at *2. Together with the overwhelming weight of procedural unconscionability, *see Burch*,

9    49 P.3d at 650-51 (applying a sliding scale), the Agreement is an unconscionable

10   adhesion contract. Accordingly, the Court declines to enforce it.

11          **C.    Rejection Option**

12          Defendants argue that Plaintiff's failure to cancel the release card and request a

13   check is an objective manifestation of assent. Because the Court finds, as discussed

14   above, that Plaintiff had entered an unconscionable adhesion contract upon receiving the

15   card, Defendants' argument is moot. Upon his release, had Plaintiff used the phone to

16   call Rapid to cancel the card and request a check, Plaintiff would have already "accepted"

17   and been bound by the terms of the Cardholder Agreement. Accordingly, whether Plaintiff

18   assented to the Agreement by failing to reject the release card is immaterial.

19   **V.    CONCLUSION**

20          The Court notes that the parties made several arguments and cited to several

21   cases not discussed above. The Court has reviewed these arguments and cases and

22   determines that they do not warrant discussion as they do not affect the outcome of the

23   Motion before the Court.

24          It is therefore ordered that Defendants' motion to compel arbitration (ECF No. 13)

25   is denied.

26          DATED THIS 30th Day of August 2021.

27

28          MIRANDA M. DU
             CHIEF UNITED STATES DISTRICT JUDGE