1
2
3
4
5

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

6   CHRISTOPHER WATKINS,

7                          Plaintiff,

8        v.

9   RAPID FINANCIAL SOLUTIONS, INC., *et al.*,

10

11                        Defendants.

Case No. 3:20-cv-00509-MMD-CSD

ORDER

12        The instant case is a class action to recover damages for prepaid debit card fees

13   charged to persons released from prison in Nevada.[1] Before the Court are the parties'

14   cross-motions for summary judgment (ECF Nos. 93 ("Plaintiff's Motion"), 95

15   ("Defendants' Motion"), 96 ("Keefe's Motion") (collectively, "Motions")) and Plaintiff's

16   motion to strike Keefe's Motion (ECF No. 99).[2]  As explained below, the Court will deny

17   the motion to strike, deny Keefe's Motion, and grant in part and deny in part Plaintiff's

18   and Defendants' Motions.

19   **I.    BACKGROUND**

20        The following is undisputed unless otherwise noted.

21        Every incarcerated individual in Nevada has an inmate trust account. (ECF No.

22   98 at 4.) The balance of this account must be returned to the individual upon their

23   release from custody. (*Id.*)

24   / / /

25

26        [1]Named plaintiff Christopher Watkins has filed suit against Defendants Rapid
     Financial Solutions, Inc. d/b/a Access Freedom Cards; Axiom Bank N.A.; and Keefe
27   Commissary Network, LLC.

28        [2]The Court has also reviewed the parties' responses and replies. (ECF Nos. 94,
     97-98, 100-04.)

### A.  Rapid, Keefe, and Axiom

Keefe is a commissary company that offers a variety of services to correctional institutions, including prepaid debit cards for released inmates. (ECF No. 93 at 9.) Keefe obtains these release card program contracts when correctional facilities submit requests for proposals for release card programs and Keefe respond to these requests with a proposal. (ECF No. 98 at 9-10.) If Keefe's proposal is accepted, then Keefe contracts with the correctional facility, and Rapid serves as a subcontractor to that commissary contract. (*Id.* at 10.; ECF No. 94 at 5.)

Rapid provides prepaid card programs which allow correctional facilities to disburse inmates' trust fund balances upon their release. (ECF Nos. 94 at 4; 98 at 4-5.) These cards are only available to released inmates. (ECF No. 98 at 5.) Rapid is not a bank and cannot lend money or issue prepaid cards. (*Id.* at 6.) Axiom, a bank, has electronically held and loaded the funds on release cards since September 2018. (*Id.*; ECF Nos. 93 at 8; 94 at 5.) Axiom does not interact with cardholders. (ECF No. 93 at 8.) Rapid, the release card program manager, works with Axiom to resolve any banking challenges or violations. (*Id.*)

### B.  Nevada Release Card Program

One of Rapid's release card programs is the Access Freedom Card ("Release Card"). (ECF No. 98 at 5.) The Release Cards are offered to correctional institutions as a means to distinguish the bank account that is held in trust for an individual inmate, and they are specific to Keefe and Nevada. (ECF Nos. 93 at 9; 98 at 5.) The Release Cards are thus only available to persons released from a Nevada correctional facility. (ECF No. 98 at 11.) Funds loaded onto Release Cards may come from an inmate's wages earned while incarcerated, money deposited on their behalf from friends and family, cash taken from the inmate at the time of their incarceration, or retirement payments. (ECF Nos. 93 at 10; 94 at 6.) Keefe first entered into a commissary services contract with the state of Nevada in 2011. (ECF No. 98 at 11.) Rapid began providing

1  the Release Card program to the Nevada Department of Corrections ("NDOC")[3] in

2  October 2014. (*Id.*)

3        To obtain this Release Card contract, Keefe marketed the Release Cards to

4  NDOC on Rapid's behalf via NDOC's competitive bidding process. (ECF No. 93 at 10.)

5  The contractual relationship for the Release Cards thus exists between NDOC and

6  Keefe, not Rapid. (*Id.*) Rapid and Keefe are subject to their own contract, making Rapid

7  a subcontractor to Keefe's contract with NDOC. (*Id.* at 11; ECF Nos. 94 at 7-8; 98 at

8  10.) NDOC is not contractually obligated to provide Release Cards to released inmates,

9  but it determines how inmate trust funds are returned to inmates. (ECF No. 98 at 11-

10  12.) It is unclear whether released inmates are initially offered the option to receive cash

11  or a check, but once a released inmate receives their Release Card, they may take out

12  the balance on a check. (*Id.* at 5-6; ECF Nos. 93 at 13; 94 at 8; 102 at 5.)

13        Rapid physically attaches the terms and conditions of the Release Card

14  ("Cardholder Agreement" or "Agreement") to blank, unloaded Release Cards.[4] (ECF No.

15  93 at 12.) The Agreement is folded around Release Cards such that only the bar code

16  of the Card is visible. (*Id.*) These unloaded Cards are then bulk shipped to NDOC. (*Id.*

17  at 12.) Upon an inmate's release, NDOC employees load the inmate's trust fund

18  balance onto their Release Card using Keefe's banking software and Rapid's computer

19  system. (ECF No. 94 at 7-8.) The funds are transferred to Axiom the next day. (*Id.* at 8;

20  ECF No. 93 at 12.)

21        Release Cards are subject to the following fees, which NDOC negotiated. (ECF

22  No. 98 at 11.) Three days after a Release Card is validated, it begins incurring a $1.50

23  weekly account maintenance fee until no funds remain. (ECF Nos. 93 at 12-13; 94 at 9;

24  95 at 8.) Cardholders must pay a $2.75 fee for every ATM withdrawal, a $1.50 fee for

25

26        [3]Defendants dispute the allegation that they contract with several Nevada
counties but do concede that they have a contractual relationship with NDOC. (ECF
27  Nos. 93 at 9-10; 94 at 5-6.) Because Plaintiff was in NDOC custody, the Court's
analysis will focus on Defendants' relationship with NDOC.

28
        [4]This has been Rapid's practice since April 2017. (ECF No. 98 at 6.)

1   every ATM balance inquiry, and a $2.99 fee for card replacement. (ECF Nos. 93 at 12-

2   13; 94 at 9.) A cardholder can avoid fees by requesting a check for the account balance,

3   making purchases where MasterCard is accepted, requesting cash back from a

4   merchant who accepts MasterCard, sending funds to their bank account via ACH

5   transfer, transferring the funds to a PayPal or Amazon account, or removing the entire

6   balance at a MasterCard principal financial institution. (ECF Nos. 93 at 13; 94 at 9; 98 at

7   8.)

8       Release Cards must be validated before they can be used, and simply loading a

9   Release Card will not validate it. (ECF No. 98 at 7.) Periodic maintenance fees will not

10   be charged until a Release Card is validated. (*Id.* at 8.[5])

11       **C.  Plaintiff's Receipt of a Release Card**

12       Plaintiff Christopher Watkins was incarcerated in an NDOC facility until his

13   release on parole on April 13, 2020. (ECF No. 93 at 8.) While Plaintiff was incarcerated,

14   his family had deposited money for him to use at the commissary, and he also earned

15   money working as a firefighter. (ECF No. 98 at 12.) He had $431.20 in his inmate trust

16   fund accounts when he was released. (*Id.*; ECF No. 93 at 15.) Plaintiff believed that

17   these funds would be paid out in cash or via a check without any discount, though he

18   did not identify the source of this belief. (*Id.* at 13; ECF No. 94 at 9-10.) Plaintiff did not

19   have any communications with Keefe or Axiom, nor did he communicate with Rapid

20   until after his release. (ECF No. 94 at 10.)

21       Plaintiff met with a NDOC caseworker on April 3, 2020, to begin the release

22   process. (ECF No. 93 at 13.) The caseworker told him that his funds would be loaded

23   onto a debit card. (*Id.*) NDOC did not offer Plaintiff alternative options for receiving his

24   inmate trust funds, although he could have cashed out his Release Card with a check.

25   (ECF Nos. 93 at 14; 94 at 10; 98 at 13.) Moreover, it is unclear whether NDOC could

26   have originally issued a check for Plaintiff's funds instead, given that one of his signed

27

28   _____

    [5]Plaintiff disputes this allegation in part because he "did not confirm the fee" and
    "simply agreed that it is the 'pamphlet' that he was not allowed to review until he was
    actually released." (ECF No. 98 at 8.)

1   release forms includes a space to denote a check number and amount. (ECF Nos. 93-5

2   at 14; 93-11 at 2.) The caseworker further told Plaintiff that his Card would be activated

3   before his release.[6] (ECF Nos. 93 at 14; 94 at 11.) Plaintiff was shown a debit card

4   attached to a pamphlet and told to sign his release papers.[7] (ECF No. 93 at 14.) Plaintiff

5   was not allowed to review the pamphlet until his release a week later. (*Id.*) He believed

6   that he had to accept the Release Card to be released from NDOC custody. (*Id.*; ECF

7   No. 94 at 11.)

8       The caseworker told Plaintiff that he would be charged fees for using the Release

9   Card and advised Plaintiff to withdraw his money as soon as possible, but Plaintiff was

10  unaware of the exact fee schedule for the Release Card. (ECF Nos. 93 at 14; 94 at 11.)

11  The caseworker did not explain other ways to avoid fees. (ECF Nos. 93 at 15; 94 at 11.)

12  Plaintiff would have preferred to receive cash or a debit card that did not charge

13  "exorbitant" fees. (ECF Nos. 93 at 14; 94 at 11.) He did not want his funds distributed

14  via a check because he had no way to cash a check without a bank account and it

15  would have been "basically impossible" for him to use a check for his post-release

16  travel. (ECF No. 98 at 14.)

17      Three days later, Plaintiff's $431.20 inmate trust fund balance was loaded onto

18  his Release Card. (ECF No. 93 at 15.) And on April 10, 2020, Plaintiff's Release Card

19  was charged its first account maintenance fee. (*Id.*; ECF No. 94 at 12.) Account

20  maintenance fees are not supposed to be levied until three days after a Release Card is

21  validated. (ECF No. 98 at 8.) It is therefore unclear exactly how and when the Card was

22  validated, as Plaintiff claims that he could not and did not activate his Release Card on

23  April 7, 2020. (ECF Nos. 93 at 15; 94 at 12.)

24  _____

25      [6]Defendants contest whether the activation actually occurred. (ECF No. 94 at
26  11.)

        [7]Defendants allege that the record does not include Plaintiff's signed Cardholder
27  Agreement. (ECF No. 94 at 11.) Plaintiff included as an exhibit some largely illegible
    release paperwork that appears to be signed by him. (ECF No. 93-11 at 2-3, 16.) The
28  pamphlet which appears to be the Cardholder Agreement does not have a signature
    line. (*Id.* at 4-13.)

Plaintiff first took possession of the Release Card and Cardholder Agreement on the date of his release, April 13, 2020. (ECF Nos. 93 at 15; 94 at 12.) Plaintiff's primary concern at that time was traveling home to Pennsylvania in a timely manner so as to not violate his parole. (*Id.* at 16; 94 at 13.) Plaintiff arrived at a convenience store on this day and was unable to complete a purchase using his Release Card until he called the customer service number on the Card. (ECF No. 98 at 13.)

Plaintiff was charged a weekly 'account maintenance fee' of $1.50 between April 10 and July 24, 2020, until his account balance reached zero. (ECF No. 93-12 at 2.) An additional $17.48 in unpaid wages was deposited onto Plaintiff's Release Card in early May 2020. (ECF No. 93 at 16.) Plaintiff was not informed of this deposit, and thus the entirety of the $17.48 was lost to account maintenance fees. (*Id.*) A total of $24.02 in fees was charged to Plaintiff's Release Card. (*Id.*)

### D. Procedural History

In October 2017, the plaintiffs in *Reichert v. Keefe Commissary Network, L.L.C.*, No. 3:17-CV-05848-BHS, filed suit in the Western District of Washington to challenge the distribution of prepaid debit cards with high fees to released inmates. *See* ECF No. 1 (W.D. Wash. Oct. 20, 2017). The *Reichert* plaintiffs named Keefe, Rapid Financial, and Cache Valley Bank as defendants. *See Reichert v. Keefe Commissary Network, L.L.C.*, No. 3:17-CV-05848-BHS, ECF No. 129 (W.D. Wash. Dec. 23, 2020). The Western District of Washington certified a nationwide class ("Nationwide Class") and a Washington state subclass ("Washington Subclass"). *See Reichert v. Keefe Commissary Network, L.L.C.*, 331 F.R.D. 541, 558 (W.D. Wash. 2019); *Reichert v. Keefe Commissary Network, L.L.C.*, No. 3:17-CV-05848-BHS, ECF No. 93 (W.D. Wash. May 28, 2019). The Washington Subclass settled with Keefe, and Keefe was dismissed from the action in January 2023. *See Reichert v. Keefe Commissary Network, L.L.C.*, No. 3:17-CV-05848-BHS, 2023 U.S. Dist. LEXIS 12237, *2 (W.D. Wash. Jan. 24, 2023). The Nationwide Class reached a settlement with the remaining defendants ("*Reichert* Settlement"), and the Western District of Washington approved the *Reichert* Settlement

on December 19, 2023. *See Reichert v. Keefe Commissary Network, L.L.C.*, No. 3:17-CV-05848, 2023 WL 8775720 (W.D. Wash. Dec. 19, 2023).

In July 2020, Plaintiff Watkins similarly filed a complaint on behalf of a class of persons incarcerated in Nevada seeking compensation for release card fees. (ECF No. 1-2.) The Court granted Plaintiffs' motion to certify a class of people recently incarcerated in Nevada who were required upon release to use prepaid debit cards which carried high fees, without any other alternative means of reimbursement. (ECF No. 65 at 16.) This case was then stayed pending the approval of the *Reichert* Settlement. (ECF Nos. 87, 89.) Now that the *Reichert* Settlement has been approved and the stay has been lifted, the parties have moved for summary judgment. (ECF Nos. 93, 95, 96, 99.)

## II.    MOTION TO STRIKE

Plaintiff moves to strike Keefe's Motion and its corresponding exhibits (ECF Nos. 96, 96-1–96-3) because, taken with Defendants' Motion, it violates this district's 30-page limit on motions for summary judgment and Keefe did not request, nor did the Court grant, leave to file this second Motion.[8] (ECF No. 99.) *See* LR 7-2(g), 7-3(a). Typically, "separately filed motions are considered together for purposes of page limits when they brief the same claims." *United States v. Sayers Constr., LLC*, No. 2:19-CV-1602-JCM-EJY, 2022 WL 772935, at *2 (D. Nev. Mar. 14, 2022), *vacated in part on other grounds on reconsideration sub nom.* 2022 WL 2275180 (D. Nev. June 22, 2022). But Keefe's Motion addresses a separate issue which, although pertaining to the same claims addressed in Defendants' Motion, is specific to Keefe: Keefe's individual liability as a purportedly unregulated entity. *See Santos v. Baca*, No. 2:11-CV-01251-KJD-NJK, 2017 WL 773874, at *2 (D. Nev. Feb. 28, 2017). Keefe has not circumvented the local rules by filing this separate Motion, and Plaintiff's motion to strike is denied.

/ / /

---

[8]Plaintiff withdrew his motion to strike two declarations filed in support of Defendants' Motion. (ECF No. 104 at 4 n.1.)

III.     **MOTIONS FOR SUMMARY JUDGMENT**

The parties have filed cross-motions for summary judgment as to each of Plaintiff's claims. The Court will address each theory of liability and corresponding defense in turn.

**A.** *Reichert* **Class Members**

The parties agree that summary judgment is warranted for all persons covered by the *Reichert* Settlement. (ECF Nos. 95 at 15; 98 at 17.) Defendants' Motion is granted against any class members who were members of the *Reichert* Settlement. This does not include any class members who have claims arising between July 31 and October 20, 2016, or after January 18, 2024, or who opted out of the *Reichert* Settlement (collectively, "Remaining Class Members").

**B.  Electronic Funds Transfer Act**

Congress enacted the Electronic Fund Transfer Act of 1978 ("EFTA") to "address concerns raised by the increasing prevalence of electronic banking transactions," as they "viewed such transactions—processed through computer networks without human interaction—as much more vulnerable to fraud, embezzlement, and unauthorized use than the traditional payment methods." *Widjaja v. JPMorgan Chase Bank, N.A.*, 21 F.4th 579, 580-81 (9th Cir. 2021) (quotation marks omitted). Under the EFTA, consumers may challenge the issuance of an unsolicited prepaid card and the imposition of service fees on a prepaid card within one year of the relevant alleged EFTA violation. *See* 15 U.S.C. §§ 1693i, 1693l-1, 1693m(g). Plaintiff alleges that Defendants violated the EFTA's restrictions on issuing unsolicited prepaid cards and charging service fees. The Court agrees as to the service fees but denies summary judgment on the prepaid card issuance claim.

**1.     Keefe's Liability**

As a threshold matter, Keefe argues that it is not a 'financial institution' subject to the requirements of EFTA Subchapter 1693. *See* 12 C.F.R. § 1005.3(a). This argument is inapplicable to Plaintiff's claims under EFTA Section 1693l-1 because the restrictions

on imposing improper service fees on general use prepaid cards are not limited to financial institutions but instead apply to "any person." *Id.*; *see also* 12 C.F.R. § 1005.20(d) (mandating that, unless certain conditions are met, "[n]o person may impose a . . . service fee with respect to a . . . general-use prepaid card").

Nor is Keefe excluded from liability under the other provisions of Subchapter 1693. The EFTA defines a 'financial institution' as "a bank, savings association, credit union, or any other person that directly *or indirectly* holds an account belonging to a consumer." 12 C.F.R. § 1005.2(i) (emphasis added); *accord* 15 U.S.C. § 1693a(9). Keefe signed a contract with NDOC to provide release card services and then subcontracted the release card program to Rapid, who, in turn, has Axiom hold the Release Card funds. Given that the "primary objective" of EFTA Subchapter 1693 is "the protection of individual consumers," the Court will liberally interpret 'indirectly holding a consumer account' to include situations, like the one at present, where a company has subcontracted out the holding of consumer accounts. 12 C.F.R. § 1005.1(b); *accord* 15 U.S.C. § 1693(b). Finding otherwise could harm consumers by allowing companies to avoid liability under the EFTA if they subcontract the actual holding of funds to another entity, regardless of whether they have benefitted financially from their subcontractors' EFTA violations or possibly even committed EFTA violations themselves.

Keefe's Motion is therefore denied.

**2.   Issuance of the Cards**

Section 1693i of the EFTA prohibits issuing unsolicited debit cards absent the following requirements. The card (1) may not be pre-validated, (2) must be accompanied by "a complete disclosure" of the recipient's rights and liabilities if they validate the card and (3) a clear explanation that the card is not validated and how it can be disposed of if validation is not desired, and (4) may be "validated only in response to a request or application from the consumer, upon verification of the consumer's identity." 15 U.S.C. § 1693i(b). The record does not clearly establish whether Plaintiff's Release Cards met all these requirements, and thus both Motions are denied as to

1  Plaintiff's claim under Section 1693i.

2          **a.     Validation of Card**

3          Plaintiff alleges that his Release Card was validated by someone else before he

4  received it on April 13, 2020. A card is validated when "the institution has . . . performed

5  all the procedures that would enable a consumer to initiate an electronic fund transfer

6  using the access device." 12 C.F.R. § 1005.5(b)(1) (defining 'not yet validated'); *accord*

7  15 U.S.C. § 1693i(c) ("[A] card . . . is validated when it may be used to initiate an

8  electronic fund transfer."). Plaintiff recounts arriving at a convenience store on the day

9  he was released from NDOC custody and received his Release Card—April 13, 2020—

10  and being unable to use his Card at the store. (ECF No. 95-5 at 29.) Plaintiff then had to

11  place a call regarding the Release Card so that he could access his money and

12  complete a purchase. (*Id.*; ECF No. 93-5 at 23-24, 37.) Thus, by Plaintiff's own account,

13  he was unable to use the Release Card to initiate an electronic fund transfer until after

14  he received it and orally requested validation. *See* 12 C.F.R. § 1005.5(b)(1), (4). Based

15  on these facts alone, it would appear that his Card was not validated until he called

16  Rapid on April 13, 2020.

17          But even though Defendants informed the Court that "a periodic maintenance fee

18  will not be charged until the release card is validated," financial records show that

19  Plaintiff paid an account maintenance fee on April 10, 2020—three days before

20  Defendants claim he validated his Release Card. (ECF Nos. 93-12 at 2; 95 at 8.)

21  Viewing Defendants' representations about maintenance fees in the light most favorable

22  to Plaintiff, a triable issue of fact remains as to when, and by whom, his Release Card

23  was validated. *See* 15 U.S.C. §§ 1693i(b)(1), (4); *Scott v. Harris*, 550 U.S. 372, 378

24  (2007).

25          **b.     Complete Disclosure of Rights and Liabilities**

26          Financial institutions generally must make certain disclosures "before a

27  consumer acquires a prepaid account." 12 C.F.R. § 1005.18(b)(1)(i). But when a

28  financial institution or third party uses a prepaid account to disburse funds to a

consumer without offering alternative means for receiving those funds, that information may instead be disclosed when the consumer receives their prepaid account. *See id.* In these instances, the entity disbursing the funds may provide the required disclosures "together with the prepaid account (e.g., in the same envelope as the prepaid account)." 12 C.F.R. § 1005.18(b)(1) (Supp. I.)

Defendants do not dispute that NDOC only offered to distribute Plaintiff's inmate trust fund balance on a Release Card, nor does Plaintiff challenge the thoroughness of the disclosures in the Cardholder Agreement or that he received the Agreement with his Release Card. However, viewing the record in the light most favorable to Plaintiff, a factual question remains as to whether NDOC also disburses inmate trust funds via check but failed to offer this option to Plaintiff. (ECF Nos. 93-5 at 14; 93-11 at 2.) *See Scott*, 550 U.S. at 378. Summary judgement is therefore denied as to whether Defendants issued Plaintiff's Release Card in compliance with Section 1693(b)(2).

### c.    Clear Explanation of Disposal

Release Cards must also be "accompanied by a clear explanation that the release card is not validated and how the consumer may dispose of the release card if validation is not desired." 15 U.S.C. § 1693i(b)(3). The Release Cards are affixed with a sticker stating, "This card is **inactive** and must be **validated**," and the Cardholder Agreement, which contains an explanation of how to dispose of an unwanted Release Card. (ECF Nos. 95 at 7-8; 98 at 7-8.) Though the record clearly establishes that Plaintiff's Release Card was accompanied by these required explanations, their clarity is uncertain. (ECF No. 93 at 15 (stating that Plaintiff could not understand most of the Agreement).) Whether these disclosures were sufficiently clear to released inmates for the purposes of Section 1693i(b)(3) is a factual question that cannot be resolved at this juncture.

The Motions are denied as to whether the issuance of Plaintiff's Release Card fully complied with EFTA Section 1693i.

/ / /

### 3.    Charging Service Fees

Plaintiff next challenges the weekly 'account maintenance fee' charged to Release Cards. Defendants argue that the fee limitations of EFTA Section 1693l-1 do not apply to Release Cards because Section 1693l-1 only covers 'general-use prepaid cards'[9] that are "marketed to the general public," 15 U.S.C. § 1693l-1(a)(2)(D)(iv); *accord* 12 C.F.R. § 1005.20(b)(4), and issued "in exchange for payment," 12 C.F.R. § 1005.20(a)(3)(i). Contrary to Defendants' assertions, the Release Cards are regulated general-use prepaid cards, and the weekly account maintenance fees violated the EFTA's service fee restrictions.

### a.    Marketed to the General Public

Release Cards are distributed to people being released from correctional institutions in Nevada—a group which may constitute the 'general public' for the purposes of the EFTA. *See Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 573 (9th Cir. 2020) ("*Brown II*") (citing 12 C.F.R. § 1005.20(b)(4) (Supp. I), https://perma.cc/6K6T-N4DM).[10] In assessing whether the Cards are 'marketed' to released inmates, the Court should consider "the means or channel through which the card may be obtained by a consumer, the subset of consumers that are eligible to obtain the card[,] and whether the availability of the card is advertised or otherwise promoted in the marketplace." *Id.* (quoting 12 C.F.R. § 1005.20(b)(4) (Supp. I)) (ellipses omitted). Applying these factors, the Court concludes that the Release Cards are marketed to people released from NDOC custody.

---

[9]These protections also extend to gift certificates and gift cards, but there is no dispute that neither of these categories includes Release Cards.

[10]Defendants argue that the Court should not adopt the Ninth Circuit's analysis in *Brown II* because the appellate court assessed only whether the plaintiff had adequately pled a claim under Section 1693l-1 for the purposes of a motion to dismiss. (ECF No. 95 at 23.) *See* 953 F.3d at 573. However, the parties in *Brown II* posed the same questions, and the Ninth Circuit conclusively held that "Defendants marketed their cards to the general public" and that Section 1693l-1 applied to the fees they had imposed. 953 F.3d at 573 ("Specifically, [defendants] contend that (1) inmates are not the general public, and (2) Defendants did not directly market the cards to inmates."). The Court will therefore adhere to this binding Ninth Circuit decision. *See Yong v. I.N.S.*, 208 F.3d 1116, 1119 n.2 (9th Cir. 2000).

1    Rapid obtains release card contracts when correctional facilities submit requests

2    for release card program proposals and a commissary company, like Keefe, responds

3    with a bid. (ECF No. 95 at 9.) This bidding process constitutes the marketplace in which

4    release card programs are sold to NDOC. *See Marketplace*, BLACK'S LAW DICTIONARY

5    (10th ed. 2019). By promoting and selling Rapid's Release Cards through the NDOC

6    bidding process, Keefe marketed those cards to NDOC.[11] (ECF No. 93 at 10.) *See also*

7    *Brown II*, 953 F.3d at 573.

8    NDOC then offers the Cards to people being released from Nevada correctional

9    facilities. Whether these Release Cards are the only option for receiving their funds is

10   immaterial to the ultimate conclusion that these Cards are marketed to released

11   inmates, as Section 1693l-1 applies regardless of whether a card is directly or indirectly

12   promoted to consumers. *See* 12 C.F.R. § 1005.20(b)(4) (Supp. I). If the Release Cards

13   are the only option for receiving inmate trust funds—as they were for Plaintiff—then the

14   Cards are indirectly marketed to released inmates. Keefe markets the Release Cards to

15   NDOC, and Defendants "know, expect, and intend" that NDOC will distribute the

16   Release Cards to people leaving correctional facilities. *Brown II*, 953 F.3d at 573. This

17   would be "the only way Defendants assure the use of and obtain payment for the

18   cards." *Id.* Alternatively, if NDOC offered released inmates the choice between a

19   Release Card or a check, then NDOC directly marketed the Release Cards to them.

20   *See* 12 C.F.R. § 1005.20(b)(4) (Supp. I) ("A card . . . is marketed to the general public if

21   the potential use of the card . . . is directly or indirectly offered . . . to the general

22   public.").

23   Either way, the Release Cards are marketed to released inmates in Nevada and

24   thus to the general public.

25

26   [11]The fact that Keefe alone markets the Release Cards to NDOC does not
     absolve Rapid of liability under Section 1693l-1. Violations of Section 1693l-1 occur
27   when illegal fees are charged to a qualifying card, not when that card is marketed.
     Section 1693l-1 merely excludes from its requirements cards that are "*not* marketed to
28   the general public." 15 U.S.C. § 1693l-1(a)(2)(D)(iv) (emphasis added). Moreover,
     Keefe markets the Release Cards on Rapid's behalf. (ECF No. 95 at 9.)

**b.  Issued in Exchange for Payment**

The Release Cards are also issued in "in exchange for payment." 12 C.F.R. § 1005.20(a)(3)(i) (defining 'general-use prepaid card'). General-use prepaid cards may be "purchased *or loaded* on a prepaid basis" under the EFTA. 15 U.S.C. § 1693l-1(a)(2)(A)(iii) (emphasis added). As a result, 'issued in exchange for payment' cannot reasonably be understood to refer exclusively to the initial point-of-sale purchase of a Release Card. *See Leigh v. Raby*, No. 3:22-CV-00034-MMD-CLB, 2024 WL 1345297, at *3 (D. Nev. Mar. 28, 2024) (explaining that the Court must interpret regulations to be cohesive with controlling statutory language and other regulations implementing that statute); *cf. Cody v. SoulCycle Inc.*, No. CV 15-6457-GHK (JEMx), 2016 WL 11129525, at *3 (C.D. Cal. Apr. 22, 2016) (finding that the phrase "'purchased on a prepaid basis in exchange for payment' . . . clearly refers to the initial point-of-sale purchase"). Regulations defining other cards covered under Section 1693l-1 support this interpretation. Store gift cards and gift certificates are similarly defined as being issued "on a prepaid basis . . . in exchange for payment," whereas loyalty, award, and promotional gift cards are only defined as being issued "on a prepaid basis." *Compare* 12 C.F.R. §§ 1005.20(a)(1), (2), *with id.* at (a)(4). The distinguishing factor between the cards that are issued 'in exchange for payment' and the cards that are not is who provided the funds loaded onto them. Prepaid cards are issued 'in exchange for payment' when their recipient, rather than their issuer, supplies the funds on the card.

With this legal issue resolved, the factual record is clear that Plaintiff's Release Cards was issued in exchange for payment because all funds loaded onto the Card belonged to him. Defendants have not shown that the Release Cards are exempt from Section 1693l-1.

**c.  Fee Limitations Under EFTA Section 1693l-1**

As the Release Cards are general-use prepaid cards subject to the fee limitations of Section 1693l-1, the Court will now assess whether Defendants violated those regulations. The EFTA prohibits imposing a service fee—that is, "a periodic fee, charge,

or penalty for holding or use of" a card—on a general-use prepaid card unless, among other requirements, the card has been inactive for twelve months and not more than one service fee is charged per month. 15 U.S.C. §§ 1693l-1(a)(3), (b)(1)-(2); *see also* 12 C.F.R. § 1005.20(a)(6) (defining 'service fee').

Financial records show that Plaintiff was charged a weekly 'account maintenance fee' of $1.50 between April 10 and July 24, 2020, until his account balance reached zero. (ECF No. 93-12 at 2.) According to a pamphlet on the Release Cards, these same weekly $1.50 fees were charged to all Release Card holders within three days of a card's activation, or 90 days of its issuance if not activated. (ECF No. 93-2 at 2, 5.) These 'account maintenance fees' are clearly "periodic fee[s] . . . for holding" any funds on Release Cards, which were levied more than once a month and less than 12 months after the Card was last used. 15 U.S.C. §§ 1693l-1(a)(3), (b)(2); *see also* 12 C.F.R. § 1005.20(d). The account maintenance fees charged to Plaintiff's Release Card were service fees charged in violation of Section 1693l-1. Plaintiff's Motion is granted, and Defendants' Motion is denied, as to Plaintiff's claims under Section 1693l-1 of the EFTA.

### 4.    Statute of Limitations

The EFTA imposes a one-year statute of limitations which accrues on "the date of the occurrence of the violation." *See* 15 U.S.C. § 1693m(g). Each violation of Section 1693l-1[12] started a new limitations period because the service fees caused Plaintiff separately accruing harms. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 & n.6 (2014) (a harm is separately accruing, and thus starts a new limitations period, when a new infringing act causes "harm to the plaintiff over and above the harm" from earlier acts). Every service fee cost Plaintiff an additional $1.50 "above and beyond the prior harm" of past service fees. *Diviacchi v. Affinion Grp., Inc.*, No. CIV.A. 14-10283-IT, 2015 WL 3631605, at *10 (D. Mass. Mar. 11, 2015), *report and recommendation adopted*, No. 14-CV-10283-IT, 2015 WL 3633522 (D. Mass. June 4,

---

[12]The Court will defer resolution of when the statute of limitations began to run for violations of Section 1693i, as this issue was not fully briefed and the Court has not yet found Defendants liable under that provision.

2015). And each improper service fee is an individual, albeit repeated, violation of Section 1693l-1. *See id.*; *Smith v. Bank of Haw.*, No. CV 16-00513 JMS-RLP, 2018 WL 1662107, at *5 (D. Haw. Apr. 5, 2018); *Gunter v. United Fed. Credit Union*, No. 3:15-CV-00483-MMD-WGC, 2018 WL 4286181, at *4 (D. Nev. Sept. 7, 2028); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 266 (D. Mass. 2019). Though the 'account maintenance fees' were a recurring weekly charge, every fee required Defendants to make an "independent determination" that the Release Card in question was not yet depleted. *Gunter*, 2018 WL 4286181, at *4 (discussing overdraft fees). Determining whether a service fee violated Section 1693l-1 here likewise requires analyzing the timing of that individual fee.[13] *See Smith*, 2018 WL 1662107, at *5.

To the extent that Remaining Class Members allege an improper service fee was charged to their Release Card on or after July 31, 2019, Defendants are not entitled to summary judgment on their Section 1693l-1 claim. (ECF No. 1 at 2.) Claims based on service fees imposed outside the one-year limit, however, are time-barred.

### C. Nevada Deceptive Trade Practices Act

The Nevada Deceptive Trade Practices Act ("NDTPA") provides a private right of action to victims of deceptive trade practices. *See Sears v. Russell Rd. Food & Beverage, LLC*, 460 F. Supp. 3d 1065, 1070 (D. Nev. 2020); *Leigh-Pink v. Rio Properties, LLC*, 512 P.3d 322, 327 (Nev. 2022); NRS § 41.600(1). To qualify as a 'victim,' Plaintiff must show that he was "directly harmed" by Defendants' alleged consumer fraud. *R.J. Reynolds Tobacco Co. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 514 P.3d 425, 433 (Nev. 2022). That is, Plaintiff must "prove that (1) an act of consumer fraud by the defendant (2) caused (3) damage to [him]." *Sattari v. Wash. Mut.*, 475 F. App'x 648, 648 (9th Cir. 2011) (quoting *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009)). For each of Plaintiff's claims under the NDTPA, the parties dispute both whether Defendants engaged in prohibited deceptive trade

---

[13]The Court declines to determine whether the statute of limitations should operate differently for service fees charged without proper initial disclosures.

16

1    practices and whether Plaintiff qualifies as a 'victim' who may bring suit under the

2    NDTPA.

3        **1.    Misrepresentation of Rights, Obligations, or Remedies**

4        Plaintiff first alleges that Defendants knowingly misrepresented his legal rights

5    and obligations when NDOC suppressed important information about the fees charged

6    to Release Cards. *See* NRS § 598.092(8) (prohibited deceptive trade practices include

7    "[k]nowingly misrepresent[ing] the legal rights, obligations or remedies of a party to a

8    transaction"). "The suppression or omission of a material fact which a party is bound in

9    good faith to disclose is equivalent to a false representation." *Noonan v. Bayview Loan*

10   *Servicing, LLC*, 438 P.3d 335 (Nev. 2019) (quoting *Nelson v. Heer*, 163 P.3d 420, 426

11   (Nev. 2007)) (brackets omitted). Defendants may have had a duty to inform Plaintiff of

12   the fees charged to his Release Card. *See* 12 C.F.R. § 1005.18(b)(1)(i). The

13   suppression or omission of the Release Card fee schedule could therefore constitute a

14   fraudulent misrepresentation prohibited by the NDTPA. *See Nelson*, 163 P.3d at 427

15   (looking to statutorily required disclosures in assessing whether an omission constituted

16   a fraudulent misrepresentation). However, the record is not clear on whether

17   Defendants were aware of NDOC's practice of denying inmates material information

18   about Release Card fees or possible alternative means of receiving their account

19   balance. *See Poole v. Nev. Auto Dealership Invs., LLC*, 449 P.3d 479, 483 (Nev. App.

20   2019) ("[A] 'knowing[ ]' act or omission under the NDTPA does not require that the

21   defendant intend to deceive with the act or omission . . . but simply that the defendant is

22   aware that the facts exist that constitute the act or omission.").

23       There are likewise factual questions as to whether Plaintiff's alleged damages

24   were "proximately caused by reliance on the . . . omission." *Nelson*, 163 P.3d at 426.

25   The proximate cause of an injury is "any cause which in natural[,] foreseeable[,] and

26   continuous sequence unbroken by any efficient intervening cause, produces the injury

27   complained of and without which the result would not have occurred." *Clark Cnty. Sch.*

28   *Dist. v. Payo*, 403 P.3d 1270, 1279 (Nev. 2017) (cleaned up). If NDOC only distributed

1   inmate trust funds on Release Cards, then NDOC's failure to share the full fee schedule

2   cannot be the proximate cause of Plaintiff's harm, as receiving additional information

3   about the fees before being released could not have changed his circumstances.[14] But

4   in the event that alternative means of distributing Plaintiff's inmate trust fund were

5   available, NDOC's omission was the proximate cause of Plaintiff's harm if Plaintiff would

6   have chosen to receive his inmate trust fund balance via that other distribution method

7   had he known about its existence and/or the entirety of the Release Card fees.

8        Given the multiple remaining factual questions, both Motions are denied as to

9   Plaintiff's claim under NDTPA Section 598.092(8).

10        **2.    Inability to Protect Own Rights**

11        Section 598.092(14) of the NDTPA prohibits knowingly taking advantage of a

12   person's "inability reasonably to protect his or her own rights or interests in a consumer

13   transaction" due to illiteracy, mental or physical infirmary, "or another similar condition

14   which manifests itself as an incapability to understand the language or terms of any

15   agreement." NRS § 598.092(14). This provision, like all provisions of the NDTPA,

16   should be afforded "liberal construction to accomplish its beneficial intent." *Poole*, 449

17   P.3d at 485.

18        While Section 598.092(14) most obviously protects persons suffering from some

19   internal impediment to consenting to an agreement, its protections extend further. *See*

20   NRS § 598.092(14) (listing examples); *Manley v. MGM Resorts Int'l*, No. 2:22-CV-

21   01906-MMD-DJA, 2023 WL 3737509, at *4 (D. Nev. May 30, 2023) (suggesting that

22   Section 598.092(14) protects intoxicated persons). Plaintiff alleges here that external

23   circumstances—namely, NDOC's refusal to allow him to review the Release Card

24   Agreement before signing it—barred him from understanding the Agreement's terms.

25   The result of NDOC's actions was functionally equivalent to contracting with an illiterate

26   or infirm consumer, as Defendants entered into an agreement with a consumer who

27

28        [14]Plaintiff had access to the Cardholder Agreement, and thus the full fee
schedule, once released. (ECF No. 93 at 15.)

necessarily lacked the capacity to understand the terms of the contract. Denying this cause of action to Plaintiff simply because the actions of NDOC, rather than his own actions or innate state of being, rendered him incapable of assenting would be manifestly unfair. Thus, as an incarcerated person in the custody of a correctional department whose alleged practice or policy was to disallow inmates from reviewing Cardholder Agreements before signing them, Plaintiff was subject to a "condition which manifest[ed] itself as an incapability to understand the language or terms of any agreement." NRS § 598.092(14).

Factual questions remain, however, as to whether Defendants were aware that NDOC engaged in this practice of prohibiting inmates from reviewing the Release Card Agreement. Both Motions are therefore denied as to NDTPA Section 598.092(14).

### 3.    Knowing Violation of State or Federal Law

Under Section 598.0923(1)(c) of the NDTPA, a person also engages in a deceptive trade practice when, in the course of their business, they knowingly violate a "federal statute or regulation relating to the sale or lease of goods or services." NRS § 598.0923(1)(c). Plaintiff specifically alleges that Defendants knowingly violated Section 1693i and 1693l-1 of the EFTA and their implementing regulations.

For the same reasons that summary judgment was denied as to Defendants' liability under EFTA Section 1693i, summary judgment is inappropriate as to whether Defendants knowingly violated NDTPA Section 598.0923(1)(c) vis-à-vis Section 1693i.

But Plaintiff has established that Defendants knowingly violated Section 1693l-1 of the EFTA. Defendants do not dispute that they charged Plaintiff a weekly service fee on his Release Card starting three days after funds were first loaded onto his Card. (ECF No. 93-12.) These fees were levied too early and too frequently to comply with Section 1693l-1. *See* 15 U.S.C. §§ 1693l-1(b)(2); 12 C.F.R. § 1005.20(d). And there is also no dispute that Defendants knew when and how often they charged Plaintiff fees for holding funds on his Release Card. (ECF No. 93-2 (Release Card pamphlet stating that users would be charged a weekly fee beginning three days after the Card is

activated or 90 days after the Card is issued).) *See Poole*, 449 P.3d at 481 (stating that a 'knowing' act under the NDTPA requires only that "the defendant is aware that the facts exist that constitute the act or omission"). Defendants knowingly violated EFTA Section 1693l-1, and Plaintiff has a private right of action under NDTPA Section 598.0923(1)(c) to challenge those EFTA violations because each illegal service fee "directly harmed" him by taking an additional $1.50 from his account. *R.J. Reynolds Tobacco Co.*, 514 P.3d at 433. The Remaining Class Members are entitled to summary judgment on their Section 598.0923(1)(c) claims vis-à-vis EFTA Section 1693l-1.[15]

### D. Conversion

Under Nevada law, conversion is "a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights." *M.C. Multi-Fam. Dev., L.L.C. v. Crestdale Assocs., Ltd.*, 193 P.3d 536, 542 (Nev. 2008) (emphasis omitted). Conversion is an act of general intent that cannot be excused by care, good faith, or lack of knowledge and thus does not require wrongful intent. *See Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1048 (Nev. 2000). Nor does conversion require the physical taking of property, as "tangible and intangible property alike can be converted." *Blige v. Terry*, 540 P.3d 421, 431 (Nev. 2023). "Although money cannot typically be the subject of a conversion claim, it can be where the money is identifiable, such as being set aside in a separate account or separately earmarked." *Dunham Tr. Co. as Tr. of Darrell N. Garmann Testamentary Tr. 2012 v. Wells Fargo Bank, N.A.*, No. 3:18-CV-00181-LRH-WGC, 2019 WL 489095, at *6 (D. Nev. Feb. 7, 2019) (citing *Hester v. Vision Airlines, Inc.*, No. 2:09-CV-0117-RLH-RJJ, 2011 WL 856871, at *3 (D. Nev. Mar. 9, 2011)); *see also Lopez v. Javier Corral, D.C.*, 367 P.3d 745 (Nev. 2010). When funds from separate individuals' Release Card accounts were taken out to pay

---

[15]The NDTPA has a four-year limitations period which begins to accrue "when the aggrieved party discovers, or by the exercise of due diligence should have discovered, the facts constituting the deceptive trade practice." NRS § 11.190(2)(d). Because the class is defined such that no members have claims arising before July 31, 2016, no NDTPA claims are time barred. (ECF No. 65.)

1   illegal service fees, Defendants converted money to which they had no right. (ECF No.

2   93-12 at 2.) *See* 15 U.S.C. § 1693l-1.

3       Defendants argue that Plaintiff's conversion claims are barred by the voluntary

4   payment doctrine, "an affirmative defense that states that a payment made voluntarily

5   cannot be recovered on the ground that there was no legal obligation to make the

6   payment." *3105 Coleman, LLC v. SMS Fin. Strategic Invs., LLC*, 542 P.3d 447 (Nev.

7   App. 2024); *accord Nev. Ass'n Servs., Inc. v. Eighth Jud. Dist. Ct.*, 338 P.3d 1250, 1253

8   (Nev. 2014). An exception to this doctrine exists, however, when "(1) one side

9   involuntarily accepted the terms of another; (2) circumstances permitted no other

10  alternative; and (3) circumstances were the result of coercive acts of the opposite

11  party." *Nev. Ass'n Servs.*, 338 P.3d at 1255 (ellipses omitted). As previously discussed,

12  triable issues of fact remain as to whether Plaintiff could reasonably use his Release

13  Card in a manner that did not incur service fees and thus other alternatives were

14  available.[16] Summary judgment on the conversion claim is denied as a result.

15  **E.  Unjust Enrichment**

16      "Unjust enrichment is the unjust retention of money or property of another against

17  the fundamental principles of justice or equity and good conscience." *Cap. Advisors,*

18  *LLC v. Cai*, 548 P.3d 1202, 1212 (Nev. 2024) (quotation marks omitted). The elements

19  of an unjust enrichment claim are "the plaintiff confers a benefit on the defendant, the

20  defendant appreciates such benefit," and the defendant accepts and retains the benefit

21  "under circumstances such that it would be inequitable for him to retain the benefit

22  without payment of the value thereof." *Certified Fire Prot. Inc. v. Precision Constr.*, 283

23  P.3d 250, 257 (Nev. 2012). The first two prongs are satisfied here, as "Defendants

24  received a benefit in the form of fees, and they were aware that they received the

25  benefit." *Brown v. Stored Value Cards, Inc.*, No. 3:15-CV-01370-MO, 2021 WL 76951,

26  at *3 (D. Or. Jan. 8, 2021) ("*Brown III*") (discussing similar test under Oregon law).

27

28      [16]For the same reasons, the Court declines to grant summary judgment as to
    whether the voluntary payment doctrine bars Plaintiff's unjust enrichment claims.

1   Prong three, however, turns in part on whether Plaintiff could reasonably avoid the
2   Card's fees. The parties dispute these factual circumstances, and a rational jury could
3   go either way in resolving their disputes. The unjust enrichment claims are not
4   susceptible to summary judgment.

### F. Takings Claim

6       Plaintiff finally brings constitutional takings claims against Defendants. *See* U.S.
7   CONST. amend. V ("[N]or shall private property be taken for public use, without just
8   compensation.")[17]; NEV. CONST. art. 1, § 8(3) ("Private property shall not be taken for
9   public use without just compensation having been first made, or secured.").[18] Because
10  no Defendants are governmental entities themselves, the Court will first assess whether
11  Defendants may fairly be said to be state actors and whether the deprivation of
12  Plaintiffs' property interests was "caused by the exercise of some right or privilege
13  created by the State or by a rule of conduct imposed by the state or by a person for
14  whom the State is responsible." *Lugar*, 457 U.S. at 937. The Court will then turn to
15  whether the Release Card fees constitute a taking *per se*.

### 1.   State Actors

17      Plaintiffs contend that Defendants are state actors under both the public function
18  test and the joint action test. "Satisfaction of any one test is sufficient to find state action,
19  so long as no countervailing factor exists." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th
20  Cir. 2003).

21      "Under the public function test, when private individuals or groups are endowed

---

[17]The Fifth Amendment Takings Clause is applicable to states through the Fourteenth Amendment Due Process Clause. *See Ward v. Ryan*, 623 F.3d 807, 810 (9th Cir. 2010).

[18]"[S]ubsection 3 of Article 1, § 8 of the Nevada Constitution is akin to the Takings Clause of the U.S. Constitution.*" O'Neil v. Las Vegas Metro. Police Dep't*, No. 2:22-CV-00474-ART-BNW, 2023 WL 3095561, at *6 (D. Nev. Apr. 26, 2023). The Nevada Supreme Court has applied the test set out by the U.S. Supreme Court in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982), in assessing the constitutionality of an alleged taking under the Nevada Constitution. *See Saticoy Bay LLC Series 350 Durango 104 v. Wells Fargo Home Mortg., a Div. of Wells Fargo Bank, N.A.*, 388 P.3d 970, 972 (Nev. 2017).

by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 924 (9th Cir. 2011) (quoting *Lee v. Katz*, 276 F.3d 550, 554-55 (9th Cir. 2002)). This test is "satisfied only on a showing that the function at issue is both traditionally and exclusively governmental." *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 748 (9th Cir. 2020) (quoting *Kirtley*, 326 F.3d at 1093). Charging fees for debit cards is not usually a governmental activity; however, returning inmate trust funds held by NDOC upon an incarcerated person's release from NDOC custody is a traditionally and exclusively governmental function. *See Brown v. Stored Value Cards, Inc.*, No. 3:15-CV-01370-MO, 2016 WL 4491836, at *2 (D. Or. Aug. 25, 2016) ("*Brown I*"), *rev'd and remanded on other grounds*, 953 F.3d 567 (9th Cir. 2020). Defendants' ability to distribute, and subsequently levy fees upon, inmate trust funds only came about by "the exercise of the state's exclusive power to incarcerate prisoners." *Knows His Gun v. Montana*, 866 F. Supp. 2d 1235, 1244 (D. Mont. 2012); *see also Brown I*, 2016 WL 4491836, at *2 (reaching this conclusion for prepaid cards used to return funds to persons released from jail). Indeed, Plaintiff received a Release Card solely because NDOC held his funds in trust while he was incarcerated, authorized Defendants to distribute these funds on Release Cards, and then issued Plaintiff a Release Card containing those inmate trust funds. *See West v. Atkins*, 487 U.S. 42, 54-55 (1988) (prison physician was a state actor where he was "authorized and obliged to treat prison inmates" and inmates could only seek care from state-authorized physicians). Distributing inmate trust funds is a public function which subjects Defendants to constitutional limitations.

Because Defendants satisfy the public function test, the Court need not consider whether they are also state actors under the joint function test.

### 2. Deprivation

Plaintiff appears to allege that he suffered a deprivation "caused by the exercise of some right or privilege created by the State" when Defendants charged

23

1   disproportionately high fees for distributing his inmate trust fund. Defendants could only

2   run the Release Card program and levy these fees because of the authority delegated

3   to them through their contract with NDOC. NDOC even set the Release Card fee

4   schedule. (ECF No. 98 at 11.) Therefore, at a high level, the fees were charged

5   pursuant to a "right or privilege created by the State." *Florer*, 639 F.3d at 922; *see also*

6   *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999).

7        NDOC did not give Plaintiff the opportunity to receive his inmate trust fund

8   balance by any means other than a Release Card. (*Id.* at 13; ECF Nos. 93 at 14; 94 at

9   10.) Thus, even if Plaintiff agreed to receive a Release Card and consequently

10  authorized the service fees, he did so only because the state deprived him of other

11  options for obtaining his money. *Cf. Wright v. Serv. Emps. Int'l Union Loc. 503*, 48 F.4th

12  1112, 1122 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 749 (2023) (state law did not create

13  a right or privilege in a union to direct the state's deductions of union dues where state

14  law required employees to authorize union dues deduction). Defendants' ability to levy

15  fees on Plaintiff's Release Card was a privilege created by NDOC.

16       **3.    Taking *Per Se***

17       Of course, to state a takings claim, Plaintiff must also establish that the alleged

18  state actors' challenged conduct falls within the purview of the Takings Clause.

19  Defendants do not challenge whether the fees they charged were put toward a public

20  use. Instead, they argue that fees charged to Release Cards are not *per se* takings

21  because they are a fair approximation of the costs of benefits received and are

22  voluntarily incurred.

23       "The Fifth Amendment does not proscribe the taking of property; it proscribes

24  taking without just compensation." *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 235

25  (2003). Fees for government services, as a result, must be a "fair approximation of the

26  cost of benefits supplied." *United States v. Sperry Corp.*, 493 U.S. 52, 60 (1989); *accord*

27  *Brown II*, 953 F.3d at 576. Release Cards are charged $1.50 in account maintenance

28  fees per week, which adds up to a minimum of $6.00 (and sometimes $7.50) per month.

Though fees need not be "precisely calibrated" to the costs of administering Release Cards, *Sperry*, 493 U.S. at 60, a "rational jury could determine that these fees exceeded a fair approximation of any benefits supplied," *Brown III*, 2021 WL 76951, at *1 (discussing $5.95 monthly fee for release cards). Summary judgment on this issue is denied so that a factfinder can decide whether the Release Card fees were "so clearly excessive as to belie their purported character as user fees." *Sperry*, 493 U.S. at 62.

Summary judgment is likewise inappropriate as to whether the fees charged to Plaintiff's Release Card were reasonably avoidable, and thus voluntarily incurred, in light of the factual disputes regarding Plaintiff's ability to use his Card without incurring fees. *See Brown III*, 2021 WL 76951, at *1-2.

In sum, both Motions are denied as to the takings claims.

## IV.    CONCLUSION

The Court notes that the parties made several arguments and cited several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

It is therefore ordered that Plaintiff's motion to strike (ECF No. 99) is denied.

It is further ordered that Plaintiff's motion for summary judgment (ECF No. 93) is granted as to his claims for certain violations of EFTA Section 1693l-1 and NDTPA Section 598.0923(1)(c) vis-à-vis EFTA Section 1693l-1, as laid out in the order. The motion is otherwise denied.

It is further ordered that Defendants' motion for summary judgment (ECF No. 95) is denied.

It is further ordered that Keefe's motion for summary judgment (ECF No. 96) is denied.

It is further ordered that the Court finds it appropriate to refer this case to United States Magistrate Judge Craig Denney to conduct a settlement conference under LR 16-5 and the case is so referred. If the parties do not settle at the settlement

conference, the Joint Pretrial Order is due within 30 days of the date the settlement conference is held.

DATED THIS 26th Day of August 2024.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE